UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| In re Dorsie Wayne Mosher, Jr.,<br><br>        Debtor.<br>------------------------------------------<br>William T. Neary, United States Trustee,<br><br>        Plaintiff,<br><br>v.<br><br>Dorsie Wayne Mosher, Jr.,<br><br>        Defendant – Debtor. | Bankruptcy No. 06-B-71261<br>Adversary No. 07-A-96013<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on an adversary proceeding brought by the U.S. Trustee to deny a discharge to the Debtor under 11 U.S.C. § 727(a)(2) and (4). For the reasons set forth herein, the Court will rule in favor of the U.S. Trustee and will deny the Debtor's discharge under 11 U.S.C. § 727(a)(2) and (4).

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## FACTS AND BACKGROUND

The following facts and procedural history are taken from the U.S. Trustee's amended

Page 1 of 19

complaint objecting to discharge, the Debtor's answer to amended complaint objecting to discharge, and from the testimony and evidence presented and admitted at the trial held on August 18 and 19, 2009.

Most of the relevant facts revolve around a corporation owned by the Debtor, named Integrated Security Technologies, Inc. ("IST"), which was formed as a Nevada corporation in 1994. Originally, the Debtor was an officer and one of five shareholders in the corporation. (Tr. 248). However, the Secretary of State of Nevada revoked the registration for IST in February 2002. (Tr. 30). At the time the registration was revoked, the Debtor owned 50% of the shares, and the remainder were owned by six other shareholders. The shareholders held a final investor meeting at that time, where the Debtor agreed to purchase the shares of all of the other shareholders for 10 cents per share, or $300. (Tr. 265). However, even after 2002, the Debtor continued to use IST as a conduit for his business activities, even though its registration had been revoked. (Tr. 32). After 2002, the Debtor and an engineer named William Gibbons were the only people involved with IST, with the exception of the Debtor's girlfriend, who performed occasional clerical work. (Tr. 125-26).

From October 2004 through October 2005, the Debtor performed consulting work for a company called Imron Corporation ("Imron"). (Tr. 77). However, the Debtor convinced Imron to pay the compensation to IST, as a corporation with a federal EIN, so that the Debtor could avoid taxes on the income. (Tr. 68-71). Imron paid $8,000 per month plus expenses during this period for work performed by the Debtor, which it deposited into a bank account listed in IST's name at Cary Bank and Trust (the "IST Account"). (Tr. 71). Even though the account was in IST's name, the Debtor freely withdrew funds from the IST Account, which he used for his own personal use, such

as cashing checks to himself and drawing checks to pay rent on his home or other living expenses. (Tr.140-41). The Debtor characterized this personal use of IST funds as "repayment of loans." (Tr. 119). The Debtor apparently considered every form of investment that he made in IST to be a "loan" to IST, including any payment he made for "cell phone, telephone, computer-related stuff and so forth" which he considered to "have legitimately been IST expenses." (Tr. 106). The Debtor claims that, by the time he filed his bankruptcy petition in July 2006, IST owed him "about a half a million dollars." (Tr. 110). The Debtor controlled when IST repaid these loans, based on whether there was any money in the IST Account, and whether he "needed the money to pay [his] bills." (Tr. 109). Even though the Debtor claims IST owed him hundreds of thousands of dollars in 2004, the Debtor continued to make "loans" to IST in 2004, 2005, 2006, and even through the beginning of 2007, after the petition date. (Tr. 105-06). During the year before filing his bankruptcy petition, in 2006, the Debtor's brother lent him $25,000 which the Debtor claims to have then "lent" to IST to fund the development of a security project he was working on in the name of IST. (Tr. 108). Thus, the Debtor claims that his brother lent the money to him, which he in turn lent to IST, rather than a loan or investment directly from his brother to IST. However, the Debtor did not list his brother as a creditor in his bankruptcy schedules. During a Rule 2004 examination of the Debtor, the Debtor stated that the reason he did not list his brother as a creditor was that he did not want to "screw" his brother, and admitted that he thought it was okay to "screw his other creditors." (Tr. 243, Pl. Ex.4). He thereafter repaid the $25,000 debt to his brother in full by the fall of 2007, using income he earned post-petition on consulting jobs for which he used IST as a conduit for payment. For example, in 2007, the Debtor performed consulting work for either Davis Marketing Group or

Graybeards R Us, and had them pay his fees and expenses to IST to avoid paying taxes on the income. (Tr. 241-42). During the course of 2007, IST then "repaid" the Debtor $69,000. (Tr. 107).

In addition to the income which the Debtor generated for IST by having payments for work done by him be paid to IST, IST may have had substantial other assets. The Debtor continued to file tax returns for IST, and the 2007 and 2008 tax returns listed $390,000 in inventory held by IST. (Tr. 262-63). Although the Debtor made a broad claim that all of the inventory is now obsolete and completely worthless, and that the listed value only appears on the tax returns for tax purposes, the Court is skeptical of the Debtor's assertion that none of the inventory has any value. The U.S. Trustee also presented evidence that IST may have had other assets in addition to the inventory, such as equipment. For example, the 2006 tax returns that the Debtor filed for IST listed two computers and computer equipment that the Debtor purchased in February and March 2006. Neither the inventory nor the computer equipment were listed in the Debtor's bankruptcy schedules as property of the Debtor.

The Debtor, either directly or through IST, also had lease receivables for two vehicles pursuant to lease agreements with Sunroom Creations, Inc. ("Sunroom"), a company that installed sunrooms in the Chicago area. Sunroom was a company which the Debtor had formed and incorporated in December 2001, and for which he was originally the president and majority shareholder. (Tr. 44). In late 2004 or early 2005, the Debtor resigned as president of Sunroom and sold his stock in the company to his son for one dollar. (Tr. 45). The Debtor owned a 2002 Drago flatbed trailer, which he agreed to lease to Sunroom, pursuant to a September 1, 2002 lease agreement between IST and Sunroom. (Tr. 52). Although the Debtor is the one who had provided

the funds to purchase the Drago trailer, it was titled in the name of IST, and the lease agreement was signed by the Debtor on behalf of IST, which was no longer an effective Nevada corporation as of the date of the agreement. (Tr. 53). The agreement provided for lease payments of $100 per month, and the Debtor acknowledges that the purpose of structuring the lease transaction was "to create a revenue stream" which IST could use to repay its loans to the Debtor. (Tr. 55-56). The Debtor also provided funds to purchase a van. (Tr. 60). He intended to title the van in the name of IST, but it was accidentally titled in the name of Sunroom. (Tr. 61). Rather than pay additional sales tax and fees to correct the title, the Debtor left the title as it was but took physical possession of the title. (Tr. 61). Just as with the Drago trailer, IST and Sunroom entered into a lease agreement dated as of September 1, 2002, whereby IST purported to lease the van to Sunroom for $500 per month. (Tr. 58-60, 216). For both of the leases, the Debtor signed on behalf of both IST and Sunroom. (Tr. 57). Sunroom made $4,200 in lease payments on the van and trailer in 2006, and $1,200 in payments in 2005. (Tr. 62-63). The rental payments were deposited into the IST Account, which the Debtor admits were "commingled" with his own funds. (Tr. 65). By July 2006, Sunroom was $14,900 behind in lease payments on the two vehicles. (Tr. 64). The Debtor repossessed the van from Sunroom on July 19, 2006, two days before he filed his bankruptcy petition, and sold it to a third party in August 2006 for $2,000. (Tr. 169). Even though the sale occurred after he filed his bankruptcy petition, he did not seek the leave of the Court to sell the van or notify the Trustee. Apparently, the Debtor abandoned the trailer at Sunroom, even though it appears to have had a value of at least $500, though there is some indication that he may have sold the trailer as well. (Tr. 94, 170).

Sunroom also owed the Debtor a substantial amount of money for money that he loaned it. Between 2002 and his resignation in 2005, the Debtor allowed Sunroom to use his personal credit cards for the business uses of Sunroom. (Tr. 45). He treated this use as a loan from himself to Sunroom, and charged Sunroom 12 percent interest on the outstanding balances on the credit cards. (Tr. 45). The Debtor's bankruptcy schedules listed over $350,000 in credit card debts owed by the Debtor, and the Debtor testified that most of that credit card debt was in respect of the amounts he "loaned" to Sunroom by letting it use his cards. (Tr. 43). However, the Debtor did not list any debt owed him by Sunroom as an asset in his bankruptcy schedules, and did not list any repayments or payments of interest by Sunroom as gross income received. In 2004 alone, Sunroom paid the Debtor over $9,000 in interest payments, and made payments of $37,000 between 2002 and 2006. (Tr. 45, 49). Sunroom filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 14, 2006.

The Debtor filed a voluntary petition for relief with this Court under Chapter 7 of the Bankruptcy Code on July 21, 2006. In Schedule B of the Debtor's petition, which lists the Debtor's personal property, the Debtor (1) listed only one personal bank account, and failed to list the IST Account, (2) listed his "stock and interests in incorporated and unincorporated businesses" and "interests in partnerships or joint ventures" as "none,"(3) listed "other liquidated debts owed to the debtor" as "none," (4) listed "other contingent and unliquidated claims of every nature" as "none, " (5) listed a 1994 Cadillac Seville as his only automobile, truck, trailer or other vehicle or accessories, and did not list the Drago trailer or van, (6) listed "none" for office equipment, furnishings, supplies, machinery, fixtures, equipment, supplies used in business and inventory, and (7) listed "none" for

"other personal property of any kind not already listed." On Schedule G, the Debtor listed "none" for "all executory contracts of any nature and all unexpired leases of real or personal property." On Schedule I, the Debtor stated that he was retired and that his monthly income consisted solely of $1,731 per month in social security benefits. On the Debtor's Statement of Financial Affairs ("SOFA"), he reported that he received no income from employment, trade, profession, or the operation of a business, either as an employee or in independent trade or business, in 2004, 2005, and 2006. On the Debtor's SOFA, he stated that his total income other than from employment or the operation of a business was $20,431 in social security benefits in 2004, $20,978 in social security benefits in 2005, and $10,286 in social security benefits between January 1 and July 21, 2006. On the Debtor's SOFA, he listed that the only property he transferred within two years prior to filing bankruptcy was the sale of a 1991 Mercedez Benz in November 2005. On the Debtor's SOFA, when asked to identify the businesses in which he was an officer, director, partner, managing director, partner, sole proprietor or self-employed during the six years prior to filing bankruptcy, he listed IST, but described it as "a Las Vegas, Nevada-based electronics company, from January 1994 through January 2002." At the Debtor's Section 341 meeting of creditors on August 31, 2006, when asked what Integrated Security Technologies was, he answered that it was a company he started in 1994, but that the company was formally dissolved in 2002 and was inactive for most of the period prior to dissolution. (Tr. 12-13). Based on the information in the bankruptcy schedules and the Debtor's statements at the 341 meeting, including his statement that IST was dissolved, the Trustee concluded that as of 2006, when the Debtor filed bankruptcy, there were no assets available for creditors, and he filed a no-asset report on September 7, 2006. (Tr. 12-13). Upon subsequent investigation by the

Trustee, he learned that IST was still active and that the Debtor may have had additional assets. (Tr. 15). The U.S. Trustee subsequently filed this adversary proceeding against the Debtor.

## DISCUSSION

### The Separateness of IST

As an initial matter, the Court will address whether IST should be treated as a separate entity from the Debtor. One of the Debtor's arguments is that he did not list certain assets in his schedules because they were assets of IST instead of assets of the Debtor. Corporations are entities whose existence and attributes are a product of state law. See, e.g., CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 89-91 (1987) ("It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."); Dean Foods Co. v. Brancel, 187 F.3d 609, 615 (7th Cir. 1999) ("corporations ... are uniquely creations of state law."). Under Nevada law, on "the first day of the first anniversary of the month following the month in which the filing was required, the charter of the corporation is revoked and its right to transact business is forfeited." Nev. Rev. Stat. Ann. 78.175(2) (West 2009). If the charter is so revoked, and the right to transact business is forfeited, "all the property and assets of the defaulting domestic corporation must be held in trust by the directors of the corporation as for insolvent corporations, and the same proceedings may be had with respect thereto as are applicable to insolvent corporations. Any person interested may institute proceedings at any time after a forfeiture has been declared, but, if the Secretary of State reinstates the charter, the proceedings must at once be dismissed and all property restored to the officers of the corporation." Nev. Rev. Stat. Ann. 78.175(5) (West 2009). The parties have not alleged that IST

had any unpaid creditors at the time the charter was revoked, and on or around the time the charter was revoked, the investors held a meeting where the Debtor offered to buy all of the other investors' interests in the corporation for $300. Therefore, since the Debtor was the only person with any interest remaining in the defaulting corporation after this purchase, the assets of the corporation were effectively liquidated to him (since he would otherwise only be holding the assets in trust for himself) and the corporation completely ceased to exist. Thereafter, all assets of the corporation were the assets of the Debtor and all purported actions of the Debtor on behalf of the defunct corporation were actually the actions of the Debtor.

Moreover, even if the entity were still to be treated as in existence under Nevada corporate law, it would be proper to disregard the corporate entity and look through to the Debtor using the theory of alter ego or reverse veil-piercing, based on the way the Debtor used the entity. After 2002, the Debtor was the sole shareholder of IST. He used his own address for the entity. He regularly commingled his own funds with those of the entity, and regularly used funds of the entity for his own personal use. He frequently used the entity for his own personal benefit rather than acting in the best interest of the entity. For example, on several occasions he had the entity sign his consulting agreements and lease agreements solely to avoid his own personal liability for taxes. He admitted that his decisions on when to force the entity to repay its loans to him were based solely on whether the entity had cash and whether he had personal bills to pay. In contracting with Imron, he did not hold out the entity as a separate entity. Rather, Imron had already decided to hire the Debtor individually, when the Debtor suggested that the consulting fees be paid to the entity, even though it was clearly the Debtor who would perform the consulting work. The Debtor suggested this

approach to avoid his personal liability for taxes on the income. The Debtor also failed to follow corporate formalities, including those necessary to maintain the registration of the entity with the Nevada Secretary of State.

Several courts have held that assets of a purportedly separate entity can be treated as assets of the estate, including for purposes of Sections 727(a)(4)(A) and 727(a)(3), where the entity is merely the alter ego of the debtor. See, e.g., Blomberg v. Riley (In re Riley), 351 B.R. 662, 671 (Bankr. E.D. Wisc. 2006) ("It is well established that property of the debtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case, and that bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the debtor.") (citing In re Sklarin, 69 B.R. 949 (Bankr. S.D. Fla. 1987)). The court in In re Riley held that, because the corporate veil should be pierced, the real estate in question was in fact the property of the debtor's estate, and thus the transfer of the property with intent to defraud satisfied the elements of Section 727(a)(2)(B). Riley, at 671-72. Similarly, the court found that "[b]ecause the court has seen fit to invoke the alter ego theory in its discussion of § 727(a)(2), [the debtor's] omission of the [real estate] from her schedules also constituted a false oath for purposes of § 727(a)(4)(A)." Riley, at 672. Here, too, it is appropriate to treat IST as a mere alter ego of the Debtor.

### 11 U.S.C. § 727(a)(4)(A)

11 U.S.C. § 727(a)(4)(A) provides that a debtor will be discharged unless "the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." To

prevail, the U.S. Trustee must prove by the preponderance of evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. Green Bay Packaging, Inc. v. Oscarson, 2007 WL 3407108, at *5 (N.D. Ill. 2007).

The purpose of § 727(a)(4) is to "enforce the debtor's duty of disclosure and to ensure that the debtors provide reliable information to those who have an interest in the administration of the estate." Neary v. Stamat (In re Stamat), 395 B.R. 59, 73 (Bankr. N.D. Ill. 2008) (citing In re Broholm, 310 B.R. 864, 879 (Bankr. N.D. Ill. 2004)). For purposes of § 727(a)(4), "a debtor's petition and schedules, statement of financial affairs, statements made at a § 341 meeting and testimony at a Rule 2004 examination all constitute statements that are made under oath." Id. Filing of false schedules with material omissions or representations with an intent to mislead creditors as to the debtor's financial condition constitutes a false oath under § 727(a)(4). Id. Therefore, it is the debtor's duty to accurately and completely list all ownership interests he or she holds in property, and it is not for the debtor "to decide which assets are to be disclosed to creditors." Id.

It is "well established that because direct evidence of fraudulent intent is rarely available, the requisite intent under Section 727(a)(4)(A) may be inferred from circumstantial evidence or by inferences based on an entire course of conduct." Green Bay Packaging, 2007 WL 3407108, at *5 (citing In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992)). Intent to deceive also includes behavior that is so reckless as to justify the finding of fraud. For example, a debtor's awareness of an omitted asset but failure to list it in the debtor's bankruptcy schedules and statements can indicate that the

debtor is recklessly indifferent to the truth. Yonikus, at 905; Clean Cut Tree Serv., Inc. v. Costello (In re Costello), 299 B.R. 882, 900 (Bankr. N.D. Ill. 2003). The "cumulative effect of a number of false oaths by the debtor with respect to a variety of matters" can establish a pattern of reckless and cavalier disregard for the truth by the debtor. Stamat, at 74 (citing Costello, 299 B.R. at 900). An omission that the debtor knows will create an erroneous impression "amounts to the same thing" as a material misrepresentation. Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein), 272 B.R. 463, 477 (Bankr. N.D. Ill. 2001) (citing In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998)). A statement "is considered material for purposes of § 727(a)(4) if it relates to the debtor's estate, involves the discovery of assets, or concerns the disposition of the debtor's property or his entitlement to discharge." Stamat, at 74 (citing Costello, 299 B.R. at 900).

The Debtor lied in his bankruptcy schedules and his SOFA about his income. He stated that he was retired and that his only income in 2004, 2005 and 2006 was his meager receipt of social security payments. Although the Debtor contends that he was not "employed" because he worked as a consultant, the schedules specifically asked about income both as an employee and in independent trade or business. Nevertheless, he failed to list the over $88,000 he earned in 2004 and 2005 as a consultant for Imron Corporation. The Debtor did not perform the consulting work as charity - he did it to receive income. Whether he received the income directly or received it as a 'distribution' from IST, he should have listed the income in his bankruptcy schedules. While he complains that he lost more money to IST than he ever got back, this is irrelevant. The schedules ask for gross income, not net income. See also In re Stamat, 395 B.R. at 71 (noting that characterization of a limited liability company as a separate legal entity is a correct statement of state

corporate law for purposes of liability, but is irrelevant for purposes of determining gross income). He also failed to list other forms of income, such as the $9,076 in interest payments that he received from Sunroom in 2004, or the rental income he received from Sunroom. As noted above, it is irrelevant that the payments were nominally made to IST rather than to the Debtor individually, since the payments would still be treated as income to the Debtor. The Trustee depends on the scheduling of income in order to better determine what assets the debtor might have, to trace assets and to determine whether property was fraudulently transferred, and to determine whether a debtor's case should be dismissed for abuse under Chapter 7.

The Debtor also lied when he stated in his schedules that he had no stock or ownership interests in any incorporated or unincorporated businesses. Even if he was unsure of the legal status of IST after the revocation of its registration, he could not omit to state his ownership interest at all. The question specifically asked about both incorporated and unincorporated businesses. While he might have felt that the stock was worthless, it is not for the debtor to choose what information is or is not relevant to the Trustee. Nor was it merely a dormant entity of only historic value. He continued to actively use the name of IST as a conduit for his business, both before and after the petition date. For example, in 2004 and 2005, over $88,000 in income came in through IST on the Imron contract. From 2002 through July 2006 the Debtor claimed that IST was working on a technology which was potentially worth more than a million dollars. (Tr. 32). Even after the petition date, the Debtor used IST as a conduit for his consulting work within months after the filing of his bankruptcy petition. IST was a source of income for the Debtor and numerous assets were hidden in the name of IST which the Trustee would have wanted to explore, such as the inventory, the

computers, the vehicles and the lease receivables. It was even more important that the Debtor at least list his ownership interest in IST because of the fact that he did not list the income he earned on consulting work through IST. Because he listed neither the income itself, nor his interest in IST, there was no way for the Trustee to discover that income had been paid to IST. At least if the Debtor had indicated his ownership interest in IST, the Trustee might have, through additional investigation, learned of his right to distributions or loan repayments from IST, and might have learned of the assets held in the name of IST. Instead, in the section which specifically asked about ownership interests in businesses, he marked "none." While he did make a reference to IST in his SOFA, he also made misleading statements that indicated he no longer had an interest in IST. In the SOFA, he stated that the ownership or involvement in the company was "from January 1994 through January 2002." From this, anyone would think that either he no longer had an ownership interest in the company or the company no longer existed. When given the opportunity to correct this misleading statement in the 341 meeting, he only strengthened the misleading character by stating that it was dissolved in 2002, and was largely inactive prior to that. It might have been a true statement that IST was dissolved in 2002, but the Debtor certainly did not treat it as if it had been dissolved, and continued to sign agreements on its behalf and to use it as a conduit for his consulting work. Moreover, the Debtor cannot have it both ways. If the Debtor truly believed the entity was dissolved, then he could not also have believed that any of the assets or income he received were assets of IST, and he should have realized that they should have been listed as his own assets in his bankruptcy schedules.

The Debtor failed to schedule numerous assets which were held by him individually or

through IST. He failed to list the IST Account, even though it was intermixed with his own personal funds unrelated to IST. He failed to list the Drago trailer or the van. He failed to list the inventory and equipment of IST. He failed to list the leases with Sunroom or the debt for past-due lease payments. He also failed to list transfers of property, such as the sale of the van and abandonment of the trailer, or the "loans" he made to IST.[1]

The Debtor claims that he did not intend to make the misstatements and omissions in his schedules, and that he was simply confused by the Bankruptcy Code. However, debtors have a duty to accurately and completely disclose information about their property interests. If he had doubt about his ability to comply with the Bankruptcy Code, he should have obtained counsel or sought other assistance. Moreover, the Debtor is a sophisticated businessman, who "has had bottom-line responsibility as president of four firms," has incorporated at least one business, and has participated in taking at least one security and manufacturing company public. (Tr. 35). Therefore, based on his experience, the Debtor is probably more sophisticated than the average layperson. Moreover, the Debtor seems to have used every opportunity of "doubt" to choose to not disclose assets, when he should have erred in favor of disclosing. Just as the Debtor attempted to use IST to hide the fact that he received income for tax purposes, the Court finds that the Debtor knowingly failed to list the income in order to minimize the appearance of assets and sources of income for bankruptcy

---

[1] It is true that, because the Debtor and IST are to be treated as a single entity, there were not actual "loans" or "transfers" of money from the Debtor to IST, since the Debtor would have only been giving money to himself. However, such money must have been subsequently transferred or spent somewhere, since it no longer seems to be in the IST Account. This is further evidence that the Debtor used IST as a shield to hide assets of the estate and transfers of such assets.

purposes. Further evidence of the Debtor's fraudulent intent was his admitted conscious and deliberate decision to not include his debt to his brother in his bankruptcy schedules. This decision indicates that he made conscious choices about what to list and what not to list in his bankruptcy schedules in order to maximize the benefit to himself and his preferred creditors. Therefore, the Court finds that the Debtor knowingly and fraudulently made false oaths or accounts in connection with his case, and should be denied a discharge under Section 727(a)(4)(A).

### 11 U.S.C. § 727(a)(2)

11 U.S.C. § 727(a)(2) provides that the court shall grant a discharge unless the debtor, "with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year of the date of the filing of the petition; or (B) property of the estate after the date of the filing of the petition." The section requires proof that the debtor (1) transferred or concealed property, (2) that belongs to the estate, (3) within one year of filing the petition, (4) with the intent to hinder, delay or defraud a creditor of the estate or the trustee. In re Stamat, 395 B.R. 59, 70 (Bankr. N.D. Ill. 2008) (citing In re Broholm, 310 B.R. 864, 877 (Bankr. N.D. Ill. 2004)). Concealment, for purposes of Section 727(a)(2), consists of "failing or refusing to divulge information to which creditors were entitled." Stamat, at 70 (citing Holstein, 299 B.R. 211, 229 (Bankr. N.D. Ill. 2003)). Concealment may occur even if creditors are not harmed by it. Stamat, at 70 (citing In re Costello, 299 B.R. at 894 (citing In re Scott, 172 F.3d 959, 968 (7th Cir.1999))). Actual intent to hinder, delay or defraud a creditor or the trustee is required under § 727(a)(2)(A), but intent may be proved by circumstantial evidence or by inferences drawn from a debtor's course

of conduct. Stamat, at 70 (citing In re Costello, 299 B.R. at 895). Fraudulent intent can also be demonstrated by showing that the debtor acted with "reckless disregard," or "the state of mind present when a debtor does not care about the truth or falsity of a statement," which is the equivalent of knowing that the representation is false and material. Stamat, at 70 (citing In re Chavin, 150 F.3d 726, 728 (7th Cir.1998)). As with Section 727(a)(4), the U.S. Trustee bears the burden of proving each element of his objection to discharge by a preponderance of the evidence. In re Scott, 172 F.3d 959, 966-67 (7th Cir. 1999). Once the U.S. Trustee has met this standard, the burden of production shifts to the debtor to come forward with a "credible explanation for his actions." Stamat, at 69-70 (citing In re Costello, 299 B.R. at 894).

By failing to list them on the Debtor's bankruptcy schedule, the Debtor concealed numerous assets of the estate from the Trustee. The Debtor failed to list his ownership interest in IST. He also failed to list in his bankruptcy schedules any of the assets which were purported to be in the name of IST, such as the IST Account, the inventory, computers and other equipment of IST, the Drago flatbed trailer and van, and the right to the lease payments on the trailer and van from Sunroom. He failed to list the debt owed to him from Sunroom, for both the past-due lease payments and for the loans he made to Sunroom through the use of his credit cards. He also failed to list the loan of nearly half a million dollars that was due and owing to him personally from IST.[2] He also sold the van,

---

[2] The Court realizes that if IST was not a separate entity from the Debtor there could be no "debt" between them. But, in light of the Debtor's argument that he did not list assets held in the name of IST or income purportedly paid to IST because he thought they were not assets of the estate, the fact that he also did not list the debt purportedly owed to him by IST makes his argument disingenuous. If he truly believed that IST was a separate entity and that the various income streams received by it were assets of IST alone, then he should have at least listed the debt owed to him by IST and his ownership interest in IST as assets of the Debtor in the schedules. The fact that he scheduled neither the assets nor his rights to payment from IST

which was titled in the name of IST but which was property of the estate, after the petition date, and without the authorization of the Court and without notifying the Trustee. He concealed the proceeds of that sale, not only by failing to list the van or the transaction in his schedules, but by having the proceeds deposited into the IST Account, which was not disclosed to the Trustee. Similarly, his income from the Imron consulting project was concealed by having it deposited into the IST Account. Some or all of that income may have subsequently been transferred to unknown recipients.

The U.S. Trustee has met his burden of proving that the Debtor concealed and transferred assets with the intent to hinder, delay or defraud creditors of the estate and the trustee. For example, the Debtor used funds that were hidden in the IST Account to pay off a pre-petition debt to his brother, while seeking a full discharge of the debts owed to his other creditors. He admitted that he did not list the debt owed to his brother in his bankruptcy schedules because he did not want to "screw" his brother but further stated that he did not mind "screwing his other creditors." He avoided a potential argument that his filing was an abuse of Chapter 7 by hiding both his pre-petition and post-petition income. He got the benefit of a no-asset report by hiding assets of the estate. He was able to surreptitiously use the funds in the IST Account as he chose without monitoring by the Trustee or his creditors because they did not know about it. The Debtor claims that his omissions and misstatements were not intentional and were caused by his misunderstanding of bankruptcy law, but as noted before, the Court is skeptical. If he did err, he consistently erred on the side of not disclosing assets, even when taking inconsistent positions. Similarly, his use of IST as a conduit to avoid paying taxes on income that he earned indicates he probably had a similar intent to use IST

---

indicates a knowing intent to conceal the income and assets. Since the schedules listed neither the assets nor the Debtor's rights to payment from IST, the Trustee had no way to discover either.

Page 18 of 19

to hide assets of the estate for bankruptcy purposes. Finally, as noted before, the Debtor is a sophisticated businessman, with years of experience in forming and running companies. Therefore, the Court finds that the Debtor, with intent to hinder, delay, or defraud creditors and the Trustee, has transferred or concealed property of the Debtor within one year before the date of the filing of the petition and property of the estate after the date of the filing of the petition, and should be denied a discharge under Section 727(a)(2).

## CONCLUSION

For the foregoing reasons, the Court will find in favor of the U.S. Trustee, under both Section 727(a)(4) and (a)(2)(A), and will deny the Debtor's discharge.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: ~~November 4~~ 11/6/09, 2009

The Honorable Manuel Barbosa
United States Bankruptcy Judge

## CERTIFICATE OF MAILING

The undersigned hereby certifies that the attached Memorandum Opinion has been served via First Class Mail on November 6, 2009 to the following:

Attorney Carole J. Ryczek
Office of the US Trustee
780 W. Regent St., Suite 304
Madison, WI 53715

Attorney George Hampilos
308 W. State Street, Suite 210
Rockford, IL 61101 53715

_____
Mimi Kuczynski, Judicial Secretary